## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN POSTAL WORKERS UNION, )
AFL-CIO )
                          )
         Plaintiff, )
                          )
v. ) Civil Action No. 1:06CV00934
) Judge: Richard J. Leon
UNITED STATES POSTAL SERVICE, ) Electronic Case Filing
                          )
         Defendant. )
                          )

## <u>DECLARATION OF CLIFTON W. WILCOX</u>

I, Clifton W. Wilcox, pursuant to 28 U.S.C §1746, declare as follows:

1. I am currently employed as a labor relations specialist at the
headquarters office of the United States Postal Service ("USPS" or "Postal Service"),
in Washington, D.C.  I have over seven years supervisory experience with the Postal
Service.

2. In my current position, I am responsible for ascertaining and
implementing certain labor policies and procedures underlying the national
collective bargaining agreement (the "National Agreement"), between the Postal
Service and the Plaintiff, American Postal Workers Union ("APWU").  I am also
familiar with USPS timekeeping policies and procedures.

3. In 2001, the Postal Service began to implement a new employee
timekeeping system known as the Time and Attendance Collection System
("TACS").  TACS was a state-of-the-art system that realized significant operational
efficiencies over the former system used by the Postal Service, known as Electronic



Time Clock ("ETC"). ETC was a localized, personal computer-based system that required manual input, storage, and transmission of employee work hour data, while TACS provided "real-time" electronic data that was automatically input into the system the instant employees clocked in or out. TACS also received work hour data, automatically, when employees called in sick or changed their work schedules under the Enterprise Resource Management System ("eRMS").. eRMS is a telephonic/computer system whereby employee leave requests are made and transformed into electronic data.

    4. TACS was deployed at the Renton, Washington Post Office in June, 2002. At that time, the National Agreement, in effect was known as the "2000 National Agreement", which had an effective date of December 18, 2001, and continues in effect, through a series of extensions, until at least, January, 2007.

    5. The USPS first notified the national office of the APWU in 1997 of the anticipated deployment of TACS. After numerous meetings, the parties reached a written agreement on April 13, 2001, wherein they expressed their understanding that any future grievances regarding the implementation of TACS at local facilities would be handled through the local grievance process rather than at the national level.

    6. Shortly after TACS was deployed at the Renton, Washington Post Office, the APWU filed a grievance alleging that, in implementing TACS, management had taken all of the data entry work previously performed by bargaining unit timekeepers, and improperly reassigned that work to USPS supervisors in violation

of article 1.6A of the 2000 National Agreement.  Article 1.6A, with certain

exceptions, essentially prohibits  supervisors from performing bargaining unit work.

A copy of article 1.6A is attached as Attachment A, hereto.

      7.  Prior to TACS, the data entry work at the Renton, Washington Post Office

consisted of payroll adjustments necessitated by changes to the employees' regular

work schedule, e.g., scheduled and unscheduled leave, and other temporary

schedule changes.  These leave request and schedule change forms were processed

by bargaining unit timekeepers who entered the payroll adjustment data into the

computers, manually.  Timekeepers were also responsible for tallying the daily

work hours for each employee and entering this data into the computer, as well.

Timekeepers also maintained paper copies of this data in the form of source

documents and periodic reports to management.

      8.  With the advent of TACS, many of these processes became obsolete and

were eliminated.  For instance, when an employee clocks in each day, her work

hours are automatically reported via internet to the central TACS database.  Her

supervisor has virtually, instant access to this information, as opposed to the old

ETC system, where a supervisor would not be aware of the employee's actual work

hours until a timekeeper manually input that information into the system,

typically, days later.

      9.  The TACS database not only automated the process of collecting employee

work hours, it also automated the process of inputting most payroll adjustment

data, through the eRMS database.  Some timekeeping duties were newly-created

under TACS, and non-supervisory timekeepers do not have a need to access this data. Thus, the need for data entry of payroll adjustments has been virtually eliminated at the Renton, Washington Post Office, as it has throughout the country.

10. In addition to these data entry duties, bargaining unit members also perform other timekeeping duties. These duties were recently set forth in detail in a policy memorandum issued by John W. Dockins, Manager of Contract Administration for the APWU, from USPS headquarters on July 25, 2006, attached as Attachment B hereto, (the Dockins Memorandum"). The Dockins Memorandum sets forth the national policy concerning post-TACS timekeeping duties and expressly provides that "TACS has not totally eliminated all bargaining unit functions previously assigned to timekeepers." The specific duties of a timekeeper are to:

- Compute daily and weekly (manual timecard) totals and record entries where required.

- Use Employee Maintenance Module to add and delete employees, create temporary job assignments, and keep employee master files current..

- Use the Badge Maintenance Module to create and assign badge IDs, and maintain badge reports to track badges..

- ...if clerks are performing the current RTAPS input, then they may continue to perform this function in Rural TACS. The rural 1314 and 1314-A time certificates are supervisor authorized documents and may be input by clerks.

- Assist the supervisor in preparation and/or submission of a properly approved Form 2240 payroll adjustment.

- Maintain files and forms that support time and attendance entries.

4

- Assist the supervisor in timekeeping functions as the supervisor may require.

- Answer time and attendance inquiries.

11.    On November 28, 2005, Regional Arbitrator Alan R. Krebs sustained the APWU's grievance and found that supervisors were improperly performing certain timekeeping duties that should have been performed by the bargaining unit. A copy of Arbitrator Krebs' award is attached as Attachment C hereto, (the "Krebs Award").

12.  The Krebs Award did not involve any timekeeping duties performed outside of the Renton, Washington Post Office.

13.  The Krebs Award involved the timekeeping duties of only one bargaining unit member, Ms. Millie Burns, at the Renton, Washington Post Office.

14.  The Krebs Award held that: "The employee who had performed the duties at issue retired when TACS was implemented.  Moreover, those duties have been substantially reduced with the new technology . . . The amount of bargaining unit work improperly assigned to supervisors is not evident from the facts presented.  In these circumstances, an award of back pay would be particularly problematic and would not be fair.  The Postal Service shall reassign the remaining duties which had previously [been] performed by Ms. Burns and is now being performed by supervisors back to the bargaining unit."

5

15. In June, 2006, I held discussions with Jim McCarthy, Director of the Clerk Division for the APWU, and Mike Morris, Assistant Director "B" of the Clerk Division for the APWU, during which I notified the APWU of the Postal Service's agreement to fully implement the Krebs Award in the Renton, Washington Post Office only. I specifically notified Mssrs. McCarthy and Morris that the Postal Service agreed to allow the local bargaining unit in Renton, Washington to perform online data entry, error corrections, and related manual data input of supervisor-approved changes to the TACS database.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10 day of January, 2007.

_____
CLIFTON W. WILCOX

# COLLECTIVE BARGAINING AGREEMENT

Between
**American
Postal Workers
Union, AFL-CIO**

And
**U.S. Postal Service**

**November 21, 2000
November 20, 2003**

*APWU*

AHoch. A

Article 1.1

# PREAMBLE

This Agreement (referred to as the **2000 National Postal Service** Agreement) is entered into by and between the United States Postal Service (hereinafter referred to as the "Employer") and the American Postal Workers Union, AFL-CIO (hereinafter referred to as the "Union"), pursuant to an **Arbitration Award issued December 18, 2001** and **Supplemental Opinion issued January 11, 2002.** The Agreement is effective as of **December 18, 2001** unless otherwise provided.

# ARTICLE 1
# UNION RECOGNITION

## Section 1. Union

The Employer recognizes the Union designated below as the exclusive bargaining representative of all employees in the bargaining unit for which each has been recognized and certified at the national level:

American Postal Workers Union, AFL-CIO—Maintenance Employees

American Postal Workers Union, AFCIO—MotorVehicle Employees

American Postal Workers Union, AFL-CIO—Postal Clerks

- The Special Delivery Messengers were merged into the Clerk Craft by Memorandum of Understanding dated November 20, 1997.

American Postal Workers Union, AFL-CIO—Mail Equipment Shops Employees

American Postal Workers Union, AFL-CIO—Material Distribution Centers Employees

1

---

## Notes:

1. **Bold Face Type** in the text indicates revised or new language. Bold Face Type in headings does not necessarily indicated change.

2. Cross-references to relevant Memorandums of Understanding and Letters of Intent are included in the text of the Agreement. The location of the cross-references is for the convenience of the reader, and in no way affects the content or intent of the Agreement, the Memorandums, or the Letters of Intent.

3. In the **2000** National Agreement, references to a union, craft or bargaining unit are limited to the APWU and the crafts that it represents, with the following understandings:

—Article 1.5: The Postal Service will continue to inform the APWU of all new positions whether or not the positions are within craft units represented by the APWU.

—Article 6: This article will continue to apply to all bargaining units covered by the September 15, 1978 Award of Arbitrator James J. Healy.

—Article 15.5.D: The Postal Service will continue to send all National level arbitration scheduling letters and moving papers for all bargaining units to the APWU.

—Article 33.2: This article will continue to permit employees in non-APWU represented crafts to make application for best qualified positions in APWU represented crafts after required procedures are followed.

viii

## Article 1.5

### Section 4. Definition

Subject to the foregoing exclusions, this Agreement shall be applicable to all employees in the regular work force of the U.S. Postal Service, as defined in Article 7, at all present and subsequently acquired installations, facilities, and operations of the Employer, wherever located.

### Section 5. New Positions

A. Each newly created position shall be assigned by the Employer to the national craft unit most appropriate for such position within thirty (30) days after its creation. Before such assignment of each new position the Employer shall consult with the Union signatory to this Agreement for the purpose of assigning the new position to the national craft unit most appropriate for such position. The following criteria shall be used in making this determination:

1. existing work assignment practices;

2. manpower costs;

3. avoidance of duplication of effort and "make work" assignments;

4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;

5. the integral nature of all duties which comprise a normal duty assignment;

6. the contractual and legal obligations and requirements of the parties.

3

## Article 1.2

### Section 2. Exclusions

The employee groups set forth in Section 1 above do not include, and this Agreement does not apply to:

1. Managerial and supervisory personnel;

2. Professional employees;

3. Employees engaged in personnel work in other than a purely non-confidential clerical capacity;

4. Security guards as defined in Public Law 91-375, 1201(2);

5. All Postal Inspection Service employees;

6. Employees in the supplemental work force as defined in Article 7;

7. Rural letter carriers;

8. Mail handlers; or

9. Letter carriers.

### Section 3. Facility Exclusions

This Agreement does not apply to employees who work in other employer facilities which are not engaged in customer services and mail processing, previously understood and expressed by the parties to mean mail processing and delivery, including but not limited to Headquarters, Area Offices, Information Service Centers, Postal Service Training and Development Institute, Oklahoma Postal Training Operations, Postal Academies, Postal Academy Training Institute, Stamped Envelope Agency or Mail Transport Equipment Centers.

2

## Article 1.6

B. The Union party to this Agreement shall be notified promptly by the Employer regarding assignments made under this provision. Should the Union dispute the assignment of the new position within thirty (30) days from the date the Union has received notification of the assignment of the position, the dispute shall be subject to the provisions of the grievance and arbitration procedure provided for herein.

## Section 6. Performance of Bargaining Unit Work

A. Supervisors are prohibited from performing bargaining unit work at post offices with 100 or more bargaining unit employees, except:

1. in an emergency;

2. for the purpose of training or instruction of employees;

3. to assure the proper operation of equipment;

4. to protect the safety of employees; or

5. to protect the property of the USPS.

B. In offices with less than 100 bargaining unit employees, supervisors are prohibited from performing bargaining unit work except as enumerated in Section 6.A. 1 through 5 above or when the duties are included in the supervisor's position description.

(The preceding Article, Article 1, shall apply to Transitional Employees)

[see Memo, page 283]

4

---

Article 2.3

## ARTICLE 2

## NON-DISCRIMINATION AND CIVIL RIGHTS

### Section 1.  Statement of Principle

The Employer and the Union agree that there shall be no discrimination by the Employer or the Union against employees because of race, color, creed, religion, national origin, sex, age, or marital status.

In addition, consistent with the other provisions of this Agreement, there shall be no unlawful discrimination against handicapped employees, as prohibited by the Rehabilitation Act.

(see Memo, page 277)

### Section 2.  Committees

There are established at the national and APWU regional/USPS Area levels Joint Committees on Human Rights. The committees will be composed of responsible representatives of the Union and responsible management officials. The committees may develop affirmative action proposals on all matters affecting minority groups. The committees will also be advised of the plan for site selection for facilities planned for national postal mail networks and major metropolitan areas, and review availability of adequate housing and public transportation. The committees shall meet as required at mutually agreeable times.

### Section 3.  Grievances

Grievances arising under this Article may be filed at Step 2 of the grievance procedure within fourteen (14) days of when the employee or the Union has first learned or may reasonably have been expected to have learned of the alleged discrimination, unless filed directly at the national level, in

5

LABOR RELATIONS

 **UNITED STATES**
**POSTAL SERVICE**

July 25, 2006

TO: ALL AREA MANAGERS, LABOR RELATIONS

SUBJECT:       Performance of Bargaining Unit Work under the Time and Attendance
                       Collection System (TACS)

Recently, the issue of bargaining unit timekeeping duties in a TACS environment has been the
subject of increased grievance/arbitration activity. Although TACS has changed the timekeeping
landscape and automated a number of duties; TACS has not totally eliminated all bargaining unit
functions previously assigned to timekeepers.

Examples of bargaining unit timekeeping duties remaining are indicated below:

   a.   Compute daily and weekly (manual timecard) totals and record entries where required.
          (F-21, 114.2b)
   b.   Use the Employee Maintenance Module to add and delete employees, create temporary
          job assignments, and keep employee master files current. (TACS T&A Clerk Course
          31267-03, p.1)
   c.   Use the Badge Maintenance Module to create and assign badge IDs, and maintain
          badge reports to track badges. (TACS T&A Clerk Course 31267-03, p1)
   d.   …if clerks are performing the current RTAPS input, then they may continue to perform
          this function in Rural TACS. The rural 1314 and 1314-A time certificates are supervisor
          authorized documents and may be input by clerks. (Rural TACS FAQs)
          http://blue.usps.gov/tacs/files/ruralfaq.doc)
   e.   Assist the supervisor in preparation and/or submission of a properly approved Form 2240
          payroll adjustment. (F-21, 711.6)
   f.    Maintain files of forms that support time and attendance entries.(F-21,114.2d)
   g.   Assist the supervisor in timekeeping functions as the supervisor may require. (F21,
          114.2e)
   h.   Answer time and attendance inquiries. (F-21, 114.2g)

To ensure compliance with the Collective Bargaining Agreement and the F-21 Time and
Attendance Manual, management should perform non-bargaining unit work only. If there are any
questions regarding the correct application of the Collective Bargaining Agreement, please
contact Clifton Wilcox at (202) 268-5916.

Sincerely,

John W. Dockins
Manager
Contract Administration (APWU)

475 L'ENFANT PLAZA SW
WASHINGTON DC  20260-4100
WWW.USPS.COM

*Attach. B*

Bcc:   Mr. Tulino
        Mr. DeMarco
        Mr. Daigneault
        Mr. Dockins
        Ms. Hayden
        Mr. A.J. Johnson
        Ms. Martin
        Mr. Rachel
        Mr. Evans
        Mr. Wilcox
        Ms. Dukes
        Mr. Boardman
        Mr. Manuel

File:   TACS (Bargaining Unit Work)
        Chron
        Reading (Wilcox)

**DocID: \\Wadchqsxfs2\labor relations\SHARED\GRV_ARB\CA102121\Wilcox\Dockins Letter on TACS1a.doc**
LR120: CWWilcox:ndm, x-5527:20260-4125:7/25/2006

DEC − 5 2005

<u>REGULAR ARBITRATION PANEL</u>

| | |
|---|---|
| In the Matter of the Arbitration | ( **Grievant:**    **Class Action** |
| between | )<br>( **Post Office:**    **Renton, Washington** |
| UNITED STATES POSTAL SERVICE | )<br>( **USPS Case No. : E00C-4E-C 02224433** |
| and | )<br>( **APWU Case No. : 200202** |
| AMERICAN POSTAL WORKERS<br>UNION, AFL-CIO | )<br>( |
| | ) |

BEFORE:

APPEARANCES:

    For the U.S. Postal Service:

    For the Union:

Place of Hearing:

Date of Hearing:

Date of Receipt of Briefs:

Date of Award:

Relevant Contract Provisions:

Contract Year:

Type of Grievance:

Alan R. Krebs, Arbitrator

Carol A. Manago

Brian Dunn

Renton, WA

September 14, 2005

October 31, 2005

November 28, 2005

Articles 1.6.A and 3.C and D

2000-2003

Class Action

## AWARD SUMMARY

    The grievance is sustained. The Postal Service violated the National Agreement by reassigning to supervisors the timekeeping work previously performed by clerks and remaining after the implementation of TACS. The Postal Service is ordered to return such work to the bargaining unit.

Alan R. Krebs, Arbitrator

Attach. C

1

**ISSUE**

The parties, being unable to agree upon a stipulated statement of the issue to be decided, agreed to have it framed by the Arbitrator. Having considered the testimony and arguments, your Arbitrator frames the issue as follows:

> Did the Postal Service violate the National Agreement when it newly assigned certain timekeeping work to supervisory personnel upon implementing the Time & Attendance Collection System (TACS) at the Renton, Washington Post Office?

> If so, what is the appropriate remedy?

**FACTS**

Millie Burns worked as a timekeeper clerk at the Renton Post Office for twenty years until she retired on June 1, 2002. In 1993 or 1994, the Postal Service implemented the Electronic Time Card (ETC) computer system for recording employees' work time in some post offices. Before the ETC system was implemented in Renton, Ms. Burns worked eight hours per day on her timekeeping functions. With the efficiencies introduced by the ETC system, her timekeeping duties were reduced to between four and six hours per day by the time of her retirement. She continued to work eight hours per day by assuming other duties, in addition to her timekeeping duties. When she retired, her duties included timekeeping for the three branches of the Renton Post Office, boxing, and relief window work, and her position title was sales & service associate/distribution clerk.

Ms. Burns' timekeeping duties were varied. They included correcting errors in clock rings, such as when employees had neglected to swipe their badges in the electronic badge reader when they went on or off duty. Some of these errors were corrected with the employee filling out a Form 1260 card, a supervisor signing off on the change, and then Ms. Burns inputting the information from that card into the ETC computer program. Ms. Burns would ensure that employees who are late,

absent, or on leave of some type, submitted Form 3971. She would enter the information from Form 3971 into the ETC computer program after the form was signed by a supervisor. In a similar manner, she would enter into the ETC program the data from Form 3189, Request for Temporary Schedule Change for Personal Convenience. In addition, she printed out a number of reports from the ETC program, monitored overtime, maintained files, ordered badges for new employees and performed other similar clerical duties. When Ms. Burns was on vacation, other clerks performed her timekeeping duties. There was no evidence that supervisors performed these duties at the Renton Post Office prior to Ms. Burns' retirement.

In 1997, the Postal Service advised the Union that it planned to replace the five timekeeping systems which it operated throughout the country, including ETC, with a single system, the Time and Attendance Collection System (TACS). The parties, at the national level, met to discuss the implementation of TACS. On April 13, 2001, they signed a letter of agreement which included the following understanding:

> Grievance Handling
> The parties understand that any grievances involving local fact circumstances, arising from the implementation of TACS are appropriate for local discussion, resolution, or arbitration, if necessary, based on the fact circumstances of those grievances.

The Postal Service and the Union agree that TACS is more efficient than the previous timekeeping systems which were utilized. Unlike the previous systems, TACS is web based, and can be accessed by supervisors on their computers for review and data input. Records are continuously updated, allowing supervisors to utilize their computers to immediately determine where employees are working. Certain duties formerly performed by timekeeping clerks were eliminated because of TACS. For instance, before TACS, timekeeping clerks would update employees' master files based on information obtained from Human Resources. TACS is now linked with the Human Resources computer system so that the master files in the post office computers are

3

automatically updated when Human Resources enters new data. With
ETC, timekeepers would manually poll clock rings. TACS
automatically transfers the clock rings into the system. ETC
required timekeepers to use and store computer disks. TACS does
not rely on disks to store information. Prior to the
implementation of TACS, timekeepers were required to print out
and distribute a number of reports. These duties have been
eliminated since the reports can be readily accessed by
supervisors on their computers.

The Postal Service implemented TACS at the Renton Post
Office on June 3, 2002. Helen Pelton was the postmaster at
Renton Post Office when TACS was implemented. She testified that
prior to its implementation, she discussed TACS with the local
Union president. Ms. Burns had been advised that with the
implementation of TACS, she would no longer perform timekeeping
duties. Rather than accept another assignment, Ms. Burns elected
to retire when TACS was implemented at the Renton Post Office.
As previously explained, TACS eliminated many of the duties which
she performed. Some of her duties were transferred to the eight
TACS clerks now working in the Seattle District office. Betty
Lock, the manager of TACS operations for Seattle District,
testified that the District employs one TACS clerk for each 1500
employees. She testified that the TACS clerks do not do data
entry. Rather, they monitor the local offices for compliance
with the requirements of TACS. Pat Queen, the manager of
accounting center support for the St. Louis accounting service
center, testified that clerks at the District level review rings
to ensure everyone is current, obtain badges for employees, and
file timekeeping documents. Inputting of timekeeping data into
TACS at the Renton Post Office, such as from Forms 3971, 1260,
and 3189 which are still utilized, is now performed by
supervisors at the Renton Post Office. Ms. Queen testified that
with TACS, payroll adjustments can be done more quickly by
supervisors on the computer than was done under the prior
practice. She testified that TACS has resulted in a nationwide
decrease in payroll adjustments. Ms. Pelton testified that with

the implementation of TACS, there was no increase in the
supervisory staff at Renton Post Office.

On June 27, 2002, the Union filed a grievance protesting the
removal of timekeeping duties from the clerk craft and the
assumption of such work by management.  At Step 1, the grievance
was denied on the basis that local management was implementing a
national program.  At the Step 2 meeting, Postmaster Pelton
similarly advised Union Local President Donald Matt that she was
denying the grievance because she was implementing a national
system.  In her written Step 2 decision, Postmaster Pelton
explained that the Postal Service had the right to assign
timekeeping duties to supervisors because such assignments relate
"to workforce performance issues as well as expediting the
identification of problems as a result of time and attendance
issues," and "[b]oth in turn directly relate to the operational
efficiency of the operation, which is vested in management."
She further explained, "Put simply, the handling of time and
attendance is a natural integration and extension of the
supervisor's obligation to monitor the work location he/she
supervises."  In an "Additions and Corrections" document and in
the Union's Step 3 appeal, submitted by Mr. Matt, he maintained
that it would be more costly to have supervisors perform TACS
duties, rather than the clerk craft.  In the Service's Step 3
decision, the Service maintained "[i]ts right to factor in
operational efficiency" in deciding which timekeeping tasks
"would be performed by supervisors or members of the bargaining
unit."

Rather than making closing oral arguments at the conclusion
of the arbitration hearing in this matter, the parties agreed to
submit post hearing briefs.  Those briefs were received by the
Arbitrator on October 31, 2005.  The Union submitted 32 complete

decisions along with its 64-page brief.  The Postal Service
submitted 8 decisions with its 24-page brief.[1]

## POSITION OF THE PARTIES

The Union contends there is a binding past practice at the
Renton Post Office of clerk employees performing timekeeping
duties.  The Union argues that this past practice gives the Union
at least an initial presumption of ownership of this timekeeping
work.  The Union maintains that the Postal Service is obligated
to provide evidence of a specific operational necessity or a
substantial efficiency reason for ending this practice and, in
addition, must bargain with the Local Union over the matter.  The
Union asserts that other than indicating that TACS was a national
initiative, the Postal Service never, during the processing of
the grievance or at arbitration, offered any reasoning for the
transfer of the work which is specific to the Renton Post Office.
According to the Union, the duties that had been performed by the
bargaining unit at Renton Post Office which still remain after
the implementation of TACS should remain the duties of the
bargaining unit.  Accordingly, the Union argues, supervisors
should not be filing documents and entering "leave, schedule
changes, higher level pay, overtime, operational function codes
and the like."

The Postal Service contends that it acted in accordance with
Article 3 of the National Agreement to maintain the efficiency of
the operation when it implemented TACS.  It maintains that TACS
promoted the efficiency of input and quick retrieval of data,
facilitated the consolidation of supervisory tasks, as well as
the functioning of several systems, eliminated many of the tasks
associated with timekeeping, such as producing a significant

---

[1]    By letter received by the Arbitrator on November 3, 2005, the Union
protested that the Postal Service in its brief had quoted Handbook F-21 when
that document had not been submitted into evidence during the hearing.  The
Union's letter indicated that a copy had been sent to the representative for
the Postal Service.  In fact, Handbook F-21 was never referenced in the
moving papers or during the Arbitration hearing.  Since that portion of the
Postal Service brief contains new evidence and argument which the Union has
not had the opportunity to rebut, it has not been addressed in this Opinion.

number of hard copy documents, and improved efficiency in the pay
adjust rate.  The Postal Service observes that with TACS,
supervisors are now in the position to authorize an employee's
time and input it into the system at the same time.  The Postal
Service asserts that the change to TACS was not a unilateral
action, inasmuch as it was discussed at national level meetings
and was the topic of informational meetings for Union and
Management officials throughout the country.  The Postal Service
points out that its Step 2 and Step 3 decisions documented its
position that its actions were based on operational efficiency.
The Postal Service argues that its actions followed Arbitrator
Snow's findings in National Decision AC-N-6922 where he
determined that timekeeping tasks were not bargaining unit work.

**DISCUSSION**

While Article 3.C and D of the National Agreement reserves
to the Employer the right "[t]o maintain the efficiency of the
operations" and "[t]o determine the methods, means, and
personnel by which such operations are to be conducted," it also
provides that such rights are "subject to the provisions of this
Agreement."  Article 1.6.A of the National Agreement
specifically provides that "[s]upervisors are prohibited from
performing bargaining unit work at post offices with 100 or more
bargaining unit employees," such as the Renton Post Office,
except in certain specified circumstances which are not
applicable here.  The parties do not define "bargaining unit
work" in the National Agreement.  As a result, that language has
been at the center of considerable controversy between the
parties.

In a National Award, Arbitrator Carlton Snow found that at
the time that the restriction on supervisors performing
bargaining unit work was negotiated, the parties understood it
to apply "to the core clerk functions of processing the mail and

7

performing window service." Case No. A-C-N-6922 (1990), p. 51.
Arbitrator Snow, in this decision, stated that there are other
functions performed by clerks, such as timekeeping, which fall
in a "gray area" and that such work may be deemed to be
bargaining unit work if established by past practice.  Relying
on the writing of Arbitrator Richard Mittenthal in "Past
Practice and the Administration of Collective Bargaining
Agreements," Proceedings of the Fourteenth Annual Meeting,
National Academy of Arbitrators (1961), Arbitrator Snow stated
that:

> ...activity rises to the level of a past practice
> where it has (1) clarity and consistency; (2)
> longevity and repetition; and (3) acceptability.

Id., p. 47.  Arbitrator Snow stated that despite a past practice
of clerks performing "gray area" work, supervisors may still
perform this work if it would be more practical or efficient for
them to do so.  Arbitrator Snow quoted from a National Award
issued by Arbitrator Sylvester Garrett in 1978, a case which was
jointly submitted to the Arbitrator at the hearing in the
dispute at hand.  Arbitrator Snow interpreted the Garrett
decision to mean that "management must advance its goal of
efficiency without sacrificing bargaining unit positions or
hours, to the extent possible." Id., at p. 24.  Arbitrator Snow
found that in the particular situations presented to him, both
supervisors and clerks performed timekeeping functions, and
therefore no binding past practice was established.  Still,
Arbitrator Snow, in the following passage indicated that
supervisors "should not always perform" the timekeeping
functions, but may do so if it is more practical or
operationally efficient:

> It is important to stress that supervisors should not
> always perform the functions at issue here.  At the
> same time, because the disputed functions have not

been contractually dedicated to members of the
bargaining unit, supervisors must be able to perform
them if it is more practical for them to do so or if
there are good faith reasons of operational efficiency
behind the performance of such duties.

*Id.*, pp. 55-56.

In a later National Award, Case No. H4C-4H-C25455 (2001),
Arbitrator Snow provided some clarification.  In that case
Arbitrator Snow determined that the Postal Service violated the
National Agreement by assigning "gray area" bargaining unit work
to nonbargaining unit personnel department employees at a
particular location.  Arbitrator Snow found that the disputed
work had been assigned within the bargaining unit for many
years.  Reasoning that in the "gray areas" nonbargaining unit
employees "must be able to perform [disputed functions] if there
are good faith reasons of operational efficiency behind the
performance of such duties," Arbitrator Snow sustained the
grievance, because, as he stated, in the situation before him,
he found "no persuasive evidence that there are exclusive
overlapping duties ... or that management distributed
assignments in this case based on fundamental concerns about
operational efficiency...."  *Id.*, pp. 27-28.  In other words,
Arbitrator Snow determined that in order to reassign bargaining
unit work out of the clerk craft bargaining unit, where such
work is in the "gray area" and not core clerk functions and
there has been a past practice of such work being assigned
exclusively to bargaining unit employees at a particular
location, there must be persuasive evidence that the
reassignment was based on operational efficiency.  The parties
appeared to have accepted this interpretation in a National
Settlement signed on December 21, 1998.  That settlement dealt
with whether supervisors may perform timekeeping duties
involving the ETC system.  As can be seen from the portions of

that National Settlement quoted below, the parties agreed that the question of whether supervisors may perform the remaining timekeeping duties with the advent of new technology, is dependent on whether such an assignment is justified by facts which establish that is "operationally more efficient" at the local level to have supervisors performing such work:

> The issue in this grievance is whether or not supervisors may perform duties involving the electronic timekeeping clock (ETC).

> The parties agreed that Arbitrator Snow in national case AC-N-6922 et. al., has already determined that timekeeping duties can be performed by supervisors when it is operationally efficient for them to do so....

> Whether or not it is operationally more efficient for the supervisor to perform the remaining timekeeping functions, if any, is a factual determination best left to the local parties. Therefore, this case is remanded to the parties at Step 3 for possible resolution or to schedule for regional arbitration as appropriate.

Similarly, as previously discussed, with the advent of TACS, the parties, at the national level, agreed "that any grievances involving local fact circumstances, arising from the implementation of TACS" are to be dealt with at the local level "based on the fact circumstances of those grievances."

At the Renton Post Office, it is undisputed that clerk craft employees, and not supervisors, exclusively performed timekeeping tasks such as entry of timekeeping data into the computer, preparation of timekeeping reports, monitoring of clock rings, monitoring timekeeping files, ordering of badges, and a variety of other timekeeping related duties. This practice existed for many years until the time that TACS was implemented at the Renton Post Office. This exclusive assignment of such timekeeping duties within the bargaining unit

rose to the level of a binding past practice at the Renton Post
Office since the past practice was clear and consistent, long
and repeated, and was accepted by both parties.  The Union
correctly points out that past practice may lose its binding
effect when there has been a substantial change in the
conditions from which the past practice arose.  In the case at
hand, there has been a change in circumstances with regard to
some, but not all the timekeeping duties, such that the Postal
Service is no longer bound to assign to bargaining unit
employees all of the timekeeping duties that they performed in
the past.  Thus, with the implementation of TACS, certain
timekeeping work was eliminated.  These tasks were either
automated as the case with the polling of clock rings or were no
longer needed, as was the case with the printing and
distribution of certain attendance reports.  Such work cannot be
claimed by the bargaining unit since it no longer exists.
However, other timekeeping duties previously performed by the
clerk craft do still exist.  Some of that work has been
transferred to clerk craft employees at the District office,
such as reviewing clock rings, obtaining badges, and certain
filing.  The Postal Service retains the right to make such work
assignment decisions within the bargaining unit.

Other work was transferred from the bargaining unit to
supervisors at the time TACS was implemented in the Renton Post
Office.  This includes entry of timekeeping data into the
computer and, presumably, filing or processing of timekeeping
forms.  If assignment of such work to supervisors improved
operational efficiency, then, as indicated in Arbitrator Snow's
National Awards discussed previously, such assignments are no
longer exclusively limited to the bargaining unit, despite the
past practice.  In essence, if the change in technology made it
more efficient for supervisors rather than clerks to perform the

11

remaining timekeeping duties, the circumstances underlying the past practice of assigning this work to the clerk craft would have changed such that the past practice may be discontinued. Absent proof of improved operational efficiency which would result from such reassignments, then the work still belongs to the bargaining unit.

Inasmuch as the Union has established a past practice at the Renton Post Office of certain timekeeping duties being assigned exclusively to the clerk craft, the burden shifts to the Postal Service to prove that the reassignment of such timekeeping duties to supervisors improves operational efficiency. Absent such proof by the Post Service, many regional arbitrators have held that such reassignments of timekeeping work out of the bargaining unit violated the National Agreement. Case No. 190C-4C-93018110 (Goldstein, 1994); Case No. B90C-4B-C (Simmelkjaer, 1997); Case No. G00C-4G-C 02145450 (Odom, 2003); Case No. E00C-4E-C 02189076 (Winston, 2003); Case No. E98C-1E-C 01090284 (Martin, 2004); Case No. E00C-4E-C 03168751 (Gilder, 2004); Case No. E00C-4E-C 02242735 (Suardi, 2005); Case No. C00C-4C-C 02232669 (Newman, 2005); Case No. C00C-4C 02235737 (Fullmer, 2005).

Here, the Postal Service has not met its burden of proving that the reassignment to supervisors of timekeeping duties previously performed by bargaining unit personnel would improve operational efficiency. It is undisputed that TACS is more efficient than the ETC system which was previously in effect at the Renton Post Office. In any event, both TACS and ETC require the entry of data into the computer. Many of the same timekeeping forms are utilized and processed under both systems. There was just insufficient proof presented at hearing that supervisors at Renton Post Office would perform these timekeeping tasks more efficiently than clerks. For instance,

the Postal Service has not demonstrated that it is more efficient for supervisors at the Renton Post Office to input data into the computer from forms such as 3971s than for clerks to continue performing these entries. In fact, there was no evidence in this regard which was specific to the Renton Post Office other than that no new supervisors were added. Bargaining unit duties cannot be transferred to supervisors merely because supervisors have time in their assigned schedule to perform additional work. Other regional arbitrators have sustained grievances regarding the transfer of timekeeping work to supervisors upon the implementation of TACS based on such insufficiency of proof by the Postal Service. Case No. H98C-1H-C 01250020 (Tranen, 2003); Case No. E00C-4E-C 02189076, *supra*; Case No. E98C-4E-C 01156983 (Escamilla, 2004); Case No. E00C-4E-C 02242735, *supra*; E98C-4E- 99247536 (Massey, 2005).

I have carefully considered the regional opinions submitted by the Postal Service which held that in particular post offices, the reassignment of timekeeping work from the clerk craft to supervisors was justified by operational efficiencies introduced with TACS. Case No. E00C-4E-C 021590695 (Klein, 2003); Case No. G98C-4G-C 01072121 (Gilder, 2003); Case No. E00C-4E-C 02186502 (Allen, 2005); Case No. F00C-4F-C 02172398 (Davis, 2005). I find the cases submitted by the Union to be more persuasive with regard to the facts presented here. As in those cases, the Postal Service has not proven that its transfer of bargaining unit work to supervisors was justified by operational efficiencies at the local level.

In sum, the Union established a binding past practice at the Renton Post Office in that certain timekeeping duties had been exclusively bargaining unit work for many years. With the introduction of TACS certain of these duties were eliminated and properly lost to the bargaining unit. Other timekeeping duties

13

performed by clerks before TACS was introduced at Renton Post Office, essentially remained after TACS was introduced.  The Postal Service has not proven that the reassignment of these timekeeping duties from the clerk craft to supervisors was justified by improved operational efficiency at the Renton Post Office.  Therefore, the Postal Service violated the National Agreement by reassigning timekeeping work from the clerk craft to supervisors when it implemented TACS at the Renton Post Office.

### AWARD OF THE ARBITRATOR

The grievance is sustained.  The Postal Service violated the National Agreement by reassigning timekeeping work from the clerk craft to supervisors at the Renton Post Office.  The employee who had performed the timekeeping duties at issue retired when TACS was implemented.  Moreover, those duties have been substantially reduced with the new technology.  Some of the remaining duties were reassigned to clerks in the District office.  The amount of bargaining unit work improperly assigned to supervisors is not evident from the facts presented.  In these circumstances, an award of back pay would be particularly problematic and would not be fair.  The Postal Service shall reassign the remaining timekeeping duties which had previously performed by Ms. Burns and is now being performed by supervisors back to the bargaining unit.

Dated:  November 28, 2005
Sammamish, Washington

/ Alan R. Krebs, Arbitrator